**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, ) | |
| ) | CR-07-157-TUC-DCB |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| Anthony Marquez, Jr., ) | **ORDER** |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

This matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1)(B) and the local rules of practice of this Court for hearing and a Report and Recommendation on the Defendant's Motion to Suppress. Before the Court is the Magistrate Judge's Report and Recommendation on the Defendant's Motion to Suppress. After presiding over an evidentiary hearing[1], the Magistrate Judge recommended to the Court that the Motion to Suppress may be denied.  The Defendant filed an Objection to this Recommendation and the Government filed a Response.

**OBJECTIONS**

Defendant objects that the "magistrate judge in this matter clearly misunderstood certain facts and law regarding [the] existence of reasonable suspicion to stop the Defendant vehicle."  (Objection at 1.) The Objections goes on to explain that "clearly the existence of a car registered to an Indian village on an Indian reservation provides nothing

---

[1] Transcript (Tr).

to support a stop and in fact suggests the complete lack of experience by this border patrol officer." (Objection at 2.) The Defendant argues that "nothing can be told from the fact that an individual either looks at an officer or doesn't look at an officer under these circumstances." (Id.)  Defendant questions all of the explanations given by the border patrol agent for his formulation of reasonable suspicion to stop the vehicle.  "The officer's articulable facts are bogus and should not have been accepted by the magistrate judge . . . " (Objection at 3.) Defendant cites to cases that do not accept reasonable suspicion based solely on generalizations that rise only to the level of a hunch and "should not be condoned by the court." (Objection at 4.)

**STANDARD OF REVIEW**

When objection is made to the findings and recommendation of a magistrate judge, the district court must conduct a de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.), *cert.denied*, 540 U.S. 900 (2003).

**DISCUSSION**

Defendant and his co-defendant are charged with conspiracy to possess marijuana (81 kg) with the intent to distribute and possession of marijuana with the intent to distribute.  The only basis for the Defendant's Motion to Suppress was the alleged lack of reasonable suspicion to stop the vehicle:

> MR. KNEIP:  My motion is limited to the stop
>
> \* \* \*
>
> THE COURT: You're just challenging the decision to make the stop.
> MR. KNEIP: The stop, right.
> THE COURT: The stop. If that's -- if you have any

more argument on that, Mr. Barry, it would seem to me that
he's challenging whether he had reasonable suspicion to make
the stop.

(Tr. 24-25.)

In the context of Border Patrol searches, the factors to be considered in determining whether "reasonable suspicion" exists to justify stopping a vehicle includes, but are not limited to: 1) characteristics of the area; 2) proximity to the border; 3) usual patterns of traffic and time of day; 4) previous alien or drug smuggling in the area; 5) behavior of the driver, including "obvious attempts to evade officers"; 6) appearance or behavior of passengers; 7) model and appearance of the vehicle; and, 8) officer experience. *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975); *see also United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997).

The sole government witness, Border Patrol Agent Alex Bonilla, testified to facts going to establish factors one, two, four and eight of *Brignoni-Ponce*[2] that were part of his formulation of reasonable suspicion to stop the vehicle, as follows:

        Q I want to direct your attention to December 31st, 2006.
        Were you on duty that day?
        A Yes, sir.
        Q What shift were you working?
        A Swing shifts.
        Q What does that mean?
        A That's -- at that time it was 2:00 to midnight.
        Q What area were you patrolling?

---

[2] Characteristics of the area, proximity to the border, previous alien or drug smuggling area, and the officer's experience.

3

1  A That day it was Federal Route 1.
2  Q Where on Federal Route 1 was your area of patrol?
3  A Pretty much when they assign you that, you go for --
   all the way from Milepost 30 all the way to the Menegers
4  Village, which is the south-most point.
5  Q And as far as the south-most point, how close is that
   to the border?
6  A It's about one mile.
7  ...
8  A Yeah, from the border itself.
   Q And that's Milepost 1 on Federal Route 1?
9  A Yeah, on Federal Route 1, yeah.
10 Q And you go up to about 30 miles inland; is that
   correct?
11 A Yeah, north.
12 Q North. Okay. Were you familiar with this area?
13 A Yeah, very much.
14 Q How -- how often had you patrolled it?
   A Actually, during that -- that time, I -- I had a lot of
15 days working that area. Normally about I'll say probably
16 assigned three or four times a week in that area.
17 Q What type of activity did you see in this area?
   A Normally you see a lot of illegal alien smuggling, a
18 lot of pedestrian walking north from the -- from the border
19 fence.
20 Q Do you see a lot of narcotics in this area?
   A Yes, we do.
21 Q Had you made narcotic stops in this area previously?
22 A I have made pedestrian, narcotics smuggling. I have
   made a -- I have been involved on narcotic and vehicles ,
23 too.
24 Q Do you get, for lack of a better term, intelligence
25 briefings about the areas that you're patrolling?
   A Yes, we do.
26 Q Had you received any about this area?
27
28                              4

\* \* \*

BY MR. BARRY:

Q The area that you're patrolling, Federal Route 1 --

A Uh-huh.

Q -- when we're talking about intelligence briefing, tell us what that is.

A Okay. That is every day they give us an update of the -- of the current events on that area. That is -- FR -- Federal Route 1 is very known to have a lot of narcotics smuggling around the area at any time, any given day, any -- any time. So everyday they debrief us on -- on -- on things that happened during the week or -- or might be happening in the future.

Q So was this a known area of narcotics smuggling?

A It's always been known.

Q Now, directing your attention to sometime around 7:00 p.m. in the evening. Where exactly where you?

A At that time I was performing a traffic stop on another vehicle at Milepost 13.

Q And this was all on Federal Route 1?

A Yes, sir.

Q Now, you said that Federal Route 1 ends approximately a mile north of the bor -- north of the border; is that correct?

A Yeah. From -- from border itself, you extend on dirt road or there's plenty of dirt roads that come from the -- from the border all the way to pavement, which is about a mile.

Q So would Milepost 13, would that then be 14 miles from the border approximately?

A Yes.

(Tr. 5 - 8.)

5

Agent Bonilla went on to describe the actions of the vehicle prior to the stop, which go to establishing factors three, five and six of *Brignoni-Ponce*[3]:

> Q Now, you said you were performing a traffic stop. Were you off to the side of the road?
> A Yes. In that particular area, the vehicle that I stopped stopped right -- his vehicle was half on the pavement and half of -- of road. My vehicle was pretty much the same way.
> Q Was there any berm on this road, any side on this road?
> A On the sides of this road, there's -- there's like a little incline there. That's why normally vehicles don't -- don't go inside because they might not be able to get out.
> Q Okay. While you were performing this -- or you said you were terminating this traffic stop, did you notice anything, any other vehicles on the road?
> A Yes. At that time I -- I noticed the vehicle in question driving to -- to my location.
> Q Okay. What --
> A Northbound.
> Q You said the vehicle, but what did you notice about this vehicle?
> A The vehicle -- normally when -- when I'm performing a traffic stop, other vehicles that approach my location, they slow down in speed and they -- they -- they normally tend to look more towards my direction, and almost-- almost pretty much taking their eyes out from the road and just -- just looking at me.
> Q And let me ask you. Were you the -- you were in a marked vehicle; is that correct?
> A Yes, sir.
> Q When you were performing this traffic stop, were your

---

[3]Usual traffic patterns, time of day, behavior of the driver and behavior of the passengers.

```
emergency lights on?
A Yes, sir, they were.
Q And what are the emergency lights? Do those include
lights on top of the vehicle?
A Yes, sir. They -- they illuminate the whole area, the
back, the south, east, west.
Q Okay. Now, the vehicle that -- you said you saw a
vehicle approaching from the north. How fast was this
vehicle going?
A Actually the vehicle was approaching from the south.
Q Oh, going north.
A Yeah, going northbound.
Q How fast was this vehicle going?
                         * * *
THE COURT: The vehicle that you had stopped, when you
stopped what direction was it going and what direction was
your car?
THE WITNESS: My vehicle was northbound and the vehicle
I stopped was northbound.
THE COURT: So on the side of the road you were both
facing north; is --
THE WITNESS: Yes.
THE COURT: -- that correct? All right.
BY MR. BARRY:
Q Again, the vehicle approaching, approximately how fast
was it going?
A I will have the same amount of speed that is normally
on the res, which is about 55 miles an hour.
Q And that's the speed limit on this highway?
A Yes.
Q What did -- what did -- as the vehicle approached, what
did you notice about it?
A Like I said before, normally the vehicles, when I make
a patrol stop in that area, they normally slow down into a
speed that I can pretty much see everybody inside the
```

7

```
vehicle and --and like I said, almost to a -- they come
almost to a -- they'd halt just looking sideways to -- to
what I'm doing. This vehicle didn't do that.
Q Did it slow down at all?
A Not to my knowledge.
                           * * *
Q Did it slow down at all?
A N o .
Q You -- and you said the vehicle that you had stopped
was partially on the road; is that correct?
A Yes.
Q How did this vehicle get around you?
A He used the southbound lane, you know, between
southbound and the middle of the road to just go -- he
didn't go off road.
Q And this was 7:00 o'clock at night in December. Was
there any sunlight?
A N o .
Q Was it totally dark?
A Yes.
Q Any other lights other than the lights on your vehicle
in that area?
A N o .
Q Now, when this vehicle passed you, what did you do?
A I -- I kept a look at it because of my safety first of
all. I want to make sure that, you know, the vehicle's not
going
to hit me. But I did notice that, you know, there was no
slowing down. I -- I couldn't catch a good eye on the
driver, but I know it didn't do the -- the normal things
like slow down and look at me.
Q Did you notice if -- how many people were in the
vehicle?
A Yes, I did notice there were two.
Q Where were they seated?
```

```
A One in the driver's seat and one in the front passenger
seat.
Q Did you wrap up the traffic stop you were doing?
A Yes, sir.
Q What did you do after that?
A I -- I got up back into my vehicle. I -- I continued
northbound to catch up to this vehicle in front of me.
...
Q What did you notice about it when you caught up to
them?
A When I caught up to the vehicle, I notice that it was
kind of riding low for -- for having two people in the front
only.
Q What do you mean by riding low?
A Normal vehicles they -- they -- they will stay leveled,
bumper high. This one was a little bit lower than that.
Q Are we talking about the front or the rear of the
vehicle?
A The rear of the vehicle.
Q Now, once you had caught up to it, other than the two
people you had seen previously, did you see anyone else --
able to see anyone else in the vehicle?
A No, not from behind.
Q Now, the fact that the vehicle was riding low, based on
your training and experience, did that signify anything to
you?

                          * * *

Q Did that signify anything to you, the fact that the
vehicle was riding low?
A Normally, due my -- due to my experience, this is one
of the common things they teach you at the academy to be on
the lookout for vehicles that kind of ride low, probably
they're - they're -- they're have some -- some kind of
```

occupant's body hidden in the back or extra cargo in the back.

\* \* \*

THE WITNESS: Not this vehicle. I ran the license plate before I performed -- I started performing a traffic stop.

\* \* \*

BY MR. BARRY:

Q So you're still following the vehicle?

A Yes, sir.

Q Okay. Did you run the license plate?

A Yes, I did.

Q What did you term -- determine?

A The vehicle came back registered out of Sacaton, Arizona.

Q Where's Sacaton?

A Sacaton I believe is about 60 miles north of the area in question.

Q Again, based on your experience in patrolling this area, was this of any significance to you?

A Yes, it is.

Q Why?

A Normally when I run license plates around that area, they come either from Sells, which is part of the Tohono O'odham Indian Reservation, or they come from Ajo or Why.

Q Anything else you noticed about the vehicle?

A Other than the two front passengers, the vehicle riding low, the license plate coming from -- back from Sacaton, this vehicle when I -- when I was approaching it to get the license plate started slowing down; that typically when -- when I'm performing a stop, the person is taking -- the driver is taking the eyes off the road and looking through the rearview mirror to make sure where I am, what I'm doing, or my -- my conduct inside the vehicle is.

10

```
     Q Now, you didn't have your emergency lights on at this
     point?
     A Not at this time.
```

(Tr. 11 - 21.)

Agent Bonilla testified that the model and the appearance of the vehicle were, as follows:

```
     Q Did you tell me what kind of a car the Defendant was
     driving?
     A Yes. I do believe it was a compact vehicle, Ford.
     Q Ford Escort?
     A Yeah.
     Q Now, tell me how low the rear end was? How far was the
     back bumper from the ground?
     A Visually looking at it, it looked low. I cannot
     estimate exactly the -- the -- the -- the measurement on
     that.
```

(Tr. 34.)

Even after the Border Patrol Agent turned on his lights and proceeded to stop the Defendant's vehicle, the vehicle behaved oddly, in a manner that suggested to the Agent that an occupant might be preparing to jump out of the vehicle, as follows:

```
     Q How fast were you going when you turned on your lights?
     A I would say approximately about 45, 50 probably.
     Q Okay. How fast was the Defendant going?
     A About the same speed.
     Q Okay. And you said something about it took them a
     quarter of a mile to --
     A Yes, sir.
```

11

```
Q Okay. You find that exceptional?
A Normally when I do a --
Q Let me ask it this way. Have you ever had that
occasion before?
A That they slow down like that? Yes.
Q Okay. Do -- when they slow down like that, do people
always jump out of the door?
A Due to my normal expectations -- not my expectation --
what has happened before, yes, they have.
Q People have?
A Yes, people.
Q Every time?
A The way he was behaving, a lot of times they do.
Q Okay. What could you see? You could see them slowing
down?
A Uh-huh.
Q Getting ready to pull over; is that right?
A He was slowing down, but he could have come at any --
at a stop at any time.
Q Yeah, but could have sped up, couldn't he?
A Yes, he could.
Q Could have driven off into the desert, couldn't he?
A Yes, he could.
Q And he didn't do any of that?
A No, he didn't.
Q And your lights were on?
A Yes, sir.
Q He would have known he was being stopped?
A Definitely.
Q And he stopped?
A Yes.
```

(Tr. 26 - 27.)

12

The Report and Recommendation finds that Agent Bonilla adequately explained the factors during testimony at the suppression hearing to support his reasonable suspicion. The Magistrate Judge considered the factors in the context of the totality of the circumstances and concluded that the Border Patrol Agent had reasonable suspicion to conduct an investigative stop of the Defendant's vehicle.

After conducting a de novo review of the record, this Court agrees. "As the list of factors set out in *Brignoni-Ponce* suggests, sometimes conduct that maybe entirely innocuous when viewed in isolation may properly be considered in arriving at a determination that reasonable suspicion exists." *United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir.), *cert.denied*, 531 U.S. 889 (2000). "In general, although eye contact, or the lack thereof, may be considered as a factor establishing reasonable suspicion, we have noted that whether the contact is suspicious or not is highly subjective and must be evaluated in light of the circumstances of each case." *Montero-Camargo*, 208 F.3d at 1135-36. Taken as an interwoven whole, the officer's experience, the lack of eye contact, the failure to slow down, the location and reputation of the area, as well as the low appearance of the vehicle amounted to reasonable suspicion of either smuggling humans or drugs. Agent Bonilla was entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. *Id.* at 1131. The factors in this instance are not overwhelming but are sufficient to constitute reasonable suspicion for the stop. *Id.* at 1139-40. In addition, no improper factors were used to formulate reasonable suspicion. *Id.*

## CONCLUSION

Accordingly, after conducting a de novo review of the record,

**IT IS ORDERED** that the Court **ADOPTS** the Report and Recommendation (Doc. No. 61) in its entirety.  The Objections (Doc. No. 62) raised by the Defendant are **OVERRULED**.

IT IS FURTHER ORDERED that Defendant's Motion To Suppress (Doc. No. 46) is **DENIED**.

DATED this 30th day of September, 2008.

David C. Bury
United States District Judge

14